**SECURITIES INDUSTRY ASSOCIATION, Plaintiff,**

v.

**FEDERAL HOME LOAN BANK BOARD, et al., Defendants.**

**Civ. A. No. 82–1920.**

United States District Court, District of Columbia.

May 9, 1984.

John M. Liftin, James B. Weidner, Harry M. Yohalem, David A. Schulz, Bruce E. Braverman, Washington, D.C., for plaintiff.

Harvey Simon, John E. Gunther, David A. Felt, Federal Home Loan Bank Bd., Washington, D.C., for defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

Plaintiff Securities Industry Association (SIA), an association representing over five hundred securities brokers, dealers, and underwriters, brought this action against the Federal Home Loan Bank Board (Board), its chairman, and its members. Plaintiff seeks a declaration of illegality of the Board's approval of applications submitted by three federal savings and loan associations to permit a service corporation each of them owns to invest in a second

corporation formed to offer limited brokerage and investment advisory services. The parties have filed cross-motions for summary judgment. For the reasons stated below, the Board's motion will be granted, and that of plaintiff will be denied.

I

The material facts are not in dispute. On May 6, 1982, the Board adopted Resolution No. 82–327, which granted the applications of Coast Federal Savings and Loan Association, Perpetual American Federal Savings & Loan Association, and California Federal Savings & Loan Association to invest in new service corporation subsidiaries.[1] Under the grant of approval, these wholly-owned service corporations will[2] become shareholders in a separate new corporation—Savings Association Financial Corporation (SAFC)—which will create its own wholly-owned subsidiary, Savings Association Investment Securities (SAIS). Both SAFC and SAIS will be Delaware corporations with their principal place of business in Tampa, Florida.[3]

SAIS, which will be a registered broker-dealer and a member of the National Association of Securities Dealers, Inc., will operate "investment centers" in the ofices of participating S & Ls. Such centers will provide the following services: (1) the execution on behalf of and for the account of others of purchases, sales, and redemptions of debt and equity securities, municipal and public utility bonds, and shares in mutual funds;[4] (2) provision to customers of investment advisory services, including portfolio analysis and valuation; and (3) the rendering of assistance to participating associations in the implementation of the brokerage program through marketing and training services, as well as advice and education about liquidity management. SAIS will charge a commission to customers for effecting securities transactions,[5] and it will charge fees to customers for portfolio analysis and evaluations, investment counseling, and similar services. SAIS will also charge initiating fees and recurring subscription fees to participating associations.

SAIS representatives will function somewhat differently than do other registered brokers. Such representatives will receive salaries rather than commissions, and they will not independently research or analyze investment opportunities or offer advice or make recommendations based on their own views. Instead, a research firm will supply SAIS representatives with investment information and advice, and it will develop a standard investment plan for various strata of customers. Although SAIS representa-

---

**1.** Coast Federal and Perpetual American filed their joint application with the FHLBB in Atlanta on August 25, 1981. California Federal filed its application with the FHLBB in San Francisco on December 16, 1981.

On March 3, 1983, the Board approved six new applications which would permit five federally-chartered savings and loan associations and one mutual savings bank to engage in securities brokerage activities through service corporation subsidiaries. These new applicants were (1) Atlantic Federal Savings & Loan Association, Fort Lauderdale, Florida; (2) First American Federal Savings & Loan Association, Asheboro, North Carolina; (3) Fortine Federal Savings & Loan Association, Clearwater, Florida; (4) Glendale Federal Savings & Loan Association, Glendale, California; (5) Home Savings of America, a FSLA, Los Angeles, California; and (6) Poughkeepsie Savings Bank, a Federal Savings Bank, Poughkeepsie, New York.

**2.** It is unclear from the record whether these plans have been implemented. The Court has not been asked for, and has not granted, a stay.

**3.** It is anticipated that subsidiaries of eight to ten S & Ls will own approximately 85 percent of the stock of SAFC, and two individuals will own the remaining 15 percent of the stock.

**4.** SAIS will not underwrite any issue of stock nor will it purchase or sell securities for its own account. Additionally, SAIS will not, in the initial stages of the proposed program, effect transactions in commodity futures contracts or options, nor will it offer discretionary securities accounts.

**5.** Varying percentages of the SAIS's commission will be paid to its clearing broker and the participating S & L. The participating S & L will receive 50 percent of the stock and 55 percent of the bond transaction fees. Commissions on mutual fund transactions will be shared equally by SAIS and the participating S & L.

tives may effect transactions within the range of services offered by SAIS, they may not recommend any investment which has not been approved for an investor of the particular customer's statum.[6] Finally, SAIS will not hold the funds or securities of customers but will act as an introducing broker, ordering a New York clearing broker to execute trades on behalf of its customers.

In approving the applications, the Board stated that it would revoke its authorization if the program materially deviated from the plan presented in the applications. The Board further required, as a condition of approval, that SAIS and SAFC conform to the Board's policy of requiring separate corporate identities for service corporations and savings and loan associations, and of prohibiting the intermingling of accounts and records of SAIS with those of the associations. Under the Board's requirements, SAIS will adopt a separate charter and by-laws, it will issue its own stock, and it will be adequately capitalized in accordance with the applicable SEC regulations. SAIS will also be governed by its own board of directors, the majority of whom may not be affiliated with any participating institution.

In addition, the Board requires the participating S & Ls to take the following prophylactic measures: First, the investment center must be identified by an appropriate and distinctive sign or trademark and all of its activities must be conducted in an area segregated from the place where the participating S & L conducts its business.[7] Second, the SAIS investment center staff must receive training from SAIS and report to SAIS regional supervisors who will visit the sites at regular intervals. The staff will, however, be considered employees of both the SAIS and the participating association and will be compensated by both. Third, other employees of the partic-

ipating S & L may only introduce customers to SAIS representatives, explain SAIS services to customers, and present prepared literature; they may not perform brokerage services. Fourth, advertising and other promotional activities must clearly identify SAIS, and not the participating S & L, as the offeror of brokerage services. Fifth, advertising and other promotional activities must clearly identify SAIS, and not the participating S & L, as the offeror of brokerage services, and upon opening an account with SAIS, customers will be required to acknowledge in writing that they understand that SAIS, and not the S & L will perform the securities brokerage services.

The Securities Industry Association claims that by permitting federal S & Ls to invest in SAFC and SAIS, the Board exceeded its authority under the Home Owners' Loan Act (HOLA) of 1933, 12 U.S.C. §§ 1461 *et seq.*, because (1) federal S & Ls may not invest in corporations which are not chartered in the State in which the investing S & L has its home office and which are not owned exclusively by S & Ls; (2) S & Ls are not authorized to engage in securities activities; and (3) the Board failed to consider whether the new activities are consistent with the "best practices" of local thrift institutions. Additionally, SIA argues that the Board's ruling violates section 21 of the Glass-Steagall Act, 12 U.S.C. § 378, which prohibits depository institutions from engaging in securities activities.

II

■ Before addressing the merits of plaintiff's objections, the Court must first resolve the threshold issue of standing. Although the Board does not contest SIA's standing to challenge its action under the Glass-Steagall Act, it argues that SIA lacks standing under HOLA because the interest it seeks to vindicate does not arguably fall

---

**6.** Such representatives may, however, advise the customer that a particular investment does not appear to be compatible with that customer's investment goals.

**7.** Moreover, the investment center may not use the name SAIS, nor may its name contain the words "savings and loan" or other words confusingly similar to the name of the participating S & L.

within the "zone of interest" to be protected or regulated by that statute.[8] *Association of Data Processing Organization v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *Cooper & Brass Fabricators v. Department of the Treasury*, 679 F.2d 951, 952 (D.C.Cir.1982).

■ The Court may find SIA to be within the zone of interest protected by HOLA even if Congress did not specifically refer to it or its members in the statutory language or the legislative history. See *Data Processing Services v. Camp, supra*, 397 U.S. at 156, 90 S.Ct. at 831, where the Supreme Court held that a trade association of data processing service providers had standing to challenge a ruling by the Comptroller which permitted bank service corporations to perform data processing services, upon its conclusion that section 4 of the Bank Service Corporation Act, 12 U.S.C. § 1864—which expressly prohibits service corporations from engaging in "any activity other than the performance of bank services · for banks"—arguably brought a competitor within the zone of interests protected by the Act.[9] Indeed, courts have explicitly found that competitors of S & Ls have standing to challenge agency action which permits a S & L to engage in certain conduct allegedly violative of HOLA. See, *e.g.*, *National State Bank of Elizabeth v. Smith*, 591 F.2d 223, 233 (3d Cir.1979). The Court therefore concludes that SIA has standing to sue.

### III

■ In order to uphold the Board's decision, the Court need not find that the Board's construction of HOLA is the only reasonable one, or that the Board reached the result that the Court would have reached had the question arisen in the first instance in a judicial proceeding. *Federal Election Commission v. Democratic Sen-*

atorial Campaign Comm'n, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981); *A.G. Becker Inc. v. Board of Governors*, 693 F.2d 136, 140 (D.C.Cir.1982). Rather, the Court must defer to the Board's interpretation of HOLA—the statute which the Board is charged with administering and it is obligated to uphold the Board's decision as long as it is not unreasonable. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980).

■ Judicial deference to the Board's ruling may be especially warranted here for a number of reasons.

First, the Board is the type of agency to which deference should presumptively be afforded because of the scope of its authority. Congress gave the Board "plenary authority" to issue regulations governing federal S & Ls. References to the Board's broad discretion to regulate federal S & Ls appear throughout the legislative history and "[n]owhere is there a suggestion of any intent somehow to limit the Board's authority." *Fidelity Federal Savings and Loan Association v. de la Cuesta*, 458 U.S. 141, 164, 102 S.Ct. 3014, 3028, 73 L.Ed.2d 664 (1982).

Second, the question of the necessity or justification for expanding the permissible activities of S & L service corporations is one which calls for highly specialized knowledge. It is reasonable to assume that Congress intended to repose ultimate authority with respect to such matters in those who are duly qualified to exercise that authority by education, training, and experience. See *York v. FHLBB*, 624 F.2d 495, 499 (4th Cir.1980); *A.G. Becker, Inc. v. Board of Governors*, 693 F.2d 136, 140 (D.C.Cir.1982).

Third, deference to the Board's ruling is appropriate because that ruling is based on

8. In order to have standing to seek judicial review of an agency action, a plaintiff must satisfy not only the "zone of interest" test, but it must also demonstrate that it has suffered some injury in fact as a result of the agency's action. The Board concedes that SIA and its members have alleged sufficient facts to satisfy the injury-in-fact prong of the standing test. See *Marshall*

*& Ilsley Corp. v. Heimann*, 652 F.2d 685, 692 (7th Cir.1981).

9. See also, *Investment Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (association of mutual funds had standing under the Glass-Steagall Act to challenge the operation of mutual investment funds by banks).

the application of the general regulatory standard—"reasonably related to the activities of federal associations"—to a particular scheme. The Board must be permitted to adapt the regulatory structure of HOLA to the changing needs of the economy. See *M & M Leasing Corp. v. Seattle First National Bank*, 563 F.2d 1377, 1382 (9th Cir.1977).

It is the Court's view that the Board's ruling may not be overturned in view of the deferential standard. However, because of the significance of the issues, the Court does not rest its decision entirely on deference to the Board. Rather, the Court has examined the substantive issues and it now finds, as explained below, that the Board's determination with respect to S & Ls service corporations is consistent with HOLA and does not contravene the Glass-Steagall Act.

## IV

HOLA governs the permissible scope of activities and the investment authority of federal S & L associations. The statutory limitations on S & Ls' activities are both functional and geographic. Section 5(c)(4)(B), which is of primary importance to this case, permits federal S & Ls to invest in service corporation subsidiaries provided that, *inter alia*,[10] (1) the subsidiary is "organized under the laws of the state in which the home office of the association is located," and (2) the entire capital stock of the subsidiary is available for purchase only by state and federal S & Ls having their home offices in that state. 12 U.S.C. § 1464(c)(4)(B).[11]

SIA argues that the three-tiered arrangement approved by the Board[12] violates these limitations. Although conceding that the S & Ls will "technically" comply with HOLA by investing in service corporations which will be incorporated in the same State where the S & L has its home office, it argues that

> [t]his structure ... cannot mask its obvious purpose: to permit the S & Ls to evade the HOLA restrictions on their investments in subsidiaries.

Plaintiff's Brief at 12. Both SAFC and SAIS will be incorporated in Delaware and have their principal place of business in Florida—States where none of the applicants is located. Additionally, as much as 15 percent of the SAFC stock will be held by two individuals—an investment banker, and an insurance executive. Based on these facts, SIA maintains that in order to prevent the frustration of the express statutory restrictions, the Board should have looked beyond the corporate structure and disapproved the arrangement because the "real" service corporation subsidiaries are SAFC and SAIS.[13]

Except in unusual circumstances, courts will not disregard the separate identities of a parent and its subsidiary, even a wholly-owned subsidiary. *Labadie Coal Co. v. Black*, 672 F.2d 92, 96 (D.C.Cir.1982);

---

10. A third proviso, not relevant here, regulates the percentage of the S & L assets that may be invested in a subsidiary.

11. Section 5(c)(4)(B) provides

    (c) An association may to such extent, and subject to such rules and regulations as the Board may proscribe from time to time, invest in, sell, or otherwise deal with the following loans, or other investments:

    . . . . .

    (B) *Service corporations.*—Investments in the capital, stock, obligations or other securities of any corporation organized under the laws of the State in which the home office of the association is located, if the entire capital stock of such corporation is available for purchase only by savings and loan associations of such State and Federal associations having

their home offices in such State, but no association may make any investment under this subparagraph if its aggregate outstanding investment under this subparagraph would exceed 3 per centum of the assets of the association, except that not less than one-half of the investment permitted under this subparagraph which exceed one per centum of assets shall be used primarily for community, inner-city, and community development purposes.

12. The first-tier service corporations allegedly have no purpose other than to create and hold shares in SAFC, the second-tier subsidiary, and that subsidiary, in turn, will create its own wholly-owned, third-tier subsidiary.

13. In support of its argument, SIA cites to *National State Bank of Elizabeth v. FHLBB*, Slip op.

*Quinn v. Butz*, 510 F.2d 743, 759 (D.C.Cir. 1975). Such separate existence will not be disregarded merely because the corporate arrangement allows an affiliate or subsidiary to engage in activities which an affiliated or parent corporation is statutorily prohibited from doing. See, for example, *Board of Governors v. Investment Co. Institute*, 450 U.S. 46, 101 S.Ct. 973, 67 L.Ed.2d 36 (1981), where the Supreme Court rejected the argument that a bank and its holding company should be treated as a single entity for purposes of the Glass-Steagall Act.

In the case at bar, the S & Ls will invest in wholly-owned service corporations which will be incorporated in the States in which they have their home offices. That is in full compliance with HOLA. Nothing in the statute or the legislative history prohib-

its service corporation subsidiaries of S & Ls from investing in out-of-state corporations or in corporations owned by persons or companies other than S & Ls. In fact, the second-tier arrangement is a longstanding and widespread practice of S & Ls.[14] Moreover, Congress which was aware of this practice,[15] declined to act, and it may be regarded as having acquiesced in this particular implementation of section 5(c)(4)(B) of HOLA by the Board. See *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980); *York v. FHLBB*, 624 F.2d 495, 499 (4th Cir.1980).[16]

## V

SIA argues next that the Board's ruling unlawfully permits federal S & Ls to engage in activities not authorized by law.

C.A. No. 76–1479 (D.N.J. Nov. 19, 1979) (on remand from the Third Circuit), in which the District Court held that the Board lacked power under section 5(c) of HOLA to authorize the acquisition of a national bank by a federal savings and loan through a wholly-owned subsidiary. The court found that the interposition of the S & L's wholly-owned subsidiary in the chain of ownership had little, if any, practical significance and that by authorizing the transaction, the Board had rendered the restrictions in section 5(c), which limit investments to state-chartered corporations whose stock is available only to S & Ls, meaningless.

Whatever authority this decision may have had is undercut by the Third Circuit's reversal upon stipulation following the passage of the Financial Institutions Deregulation and Monetary Control Act. Additionally, *Elizabeth* is distinguishable from the case at bar. First, the S & L in *Elizabeth* fostered and encouraged the perception that its second-tier subsidiary was affiliated with the S & L. Second, the Board's own regulations forbade service corporations from acquiring an entity with the word "National" in its name. Finally, nothing in the language of HOLA proscribes a service corporation from engaging in brokerage activities, whereas the activity in *Elizabeth*—the acquisition of a federally-chartered corporation—is specifically prohibited. See *Rettig v. Arlington Heights Federal S & L Association*, 405 F.Supp. 819 (N.D.Ill. 1975).

14. The Board states that the second-tier arrangement has become extremely widespread over the last ten years in such areas as real estate development and sales, mortgage banking, and various aspects of property management. See

Affidavit of F.M. Dorer, Exhibit 13 to Defendants' Motion for Summary Judgment. The Board states that federal S & Ls have invested over $1.5 billion in second- and third-tier subsidiaries. Defendants' Brief at 1.

15. A GAO report submitted to Congress discusses a length service corporation investments in less-than wholly-owned subsidiaries and subsidiaries chartered outside the domicile of the investing association. The Board submitted to Congress a detailed response to the GAO's report, conceding that it had authorized investments by service corporations in non-wholly-owned subsidiaries. The Board responded to criticism that this practice may circumvent the ownership restrictions of HOLA, by stating that

> Section 5(c) of the HOLA and Section 545.-9–1 require that a first tier service corporation be organized under the law of the State in which the home office of an investing Federal association is located. There is no present statutory or regulatory restriction on either the location of offices of such corporations, on the place of incorporating a subsidiary of service corporation or on the situs of activities of such corporation.

Defendants' Exhibit 8, Bank Board Response at 32. In addition, Senator Proxmire, Chairman of the Banking, Housing and Urban Affairs Committee, and Senator Cranston, Chairman of the Subcommittee on Financial Institutions, sent letters to the Board's Chairman regarding this issue, again demonstrating that Congress was apprised of and considered the service corporation issue.

16. In *York*, the Fourth Circuit upheld the Board's practice of approving S & L conversions

■ The power of federal S & L associates to provide securities-related services through a service corporation arises from section 5(c) of HOLA, 12 U.S.C. § 1464(c), which authorizes federal S & Ls to invest in subsidiary corporations. While Congress intended to limit service corporations to the performance of services and functions related to the business of S & L associations,[17] it delegated to the Board the responsibility of determining which activities were so related. Pursuant to this congressional mandate, the Board has promulgated comprehensive regulations governing the authority of federal S & Ls to invest in service corporations, and it has delineated preapproved activities which automatically qualify such service corporations as permissible investments. See 12 C.F.R. § 545.9–1. It is clear that, to the extent that a service corporation engages in activities which are not pre-approved, the S & L may invest in such corporation only with the Board's consent. *Rettig v. Arlington Heights Federal Savings & Loan Ass'n,* 405 F.Supp. 819, 824 (N.D.Ill.1975).

The limited brokerage and investment advisory services proposed to be offered through the subsidiary of S & L service corporations under the scheme under consideration here were not among the pre-approved activities listed in the applicable regulations. Accordingly, the S & Ls applied for approval of their investment pursuant to section 545.9–1(c)(24) which provides that a service corporation in which a federal association may invest is permitted to engage in "such other activities reasonably related to the activities of the Federal association as the Board may approve." After conducting a hearing, the Board concluded that the brokerage services to be offered by SAFC and SAIS are "reasonably related" to the activities of federal associations, and it therefore approved the applications.

■ SIA not only disagrees with this determination, but it also challenges the validity of the standard itself.[18] SIA argues that because HOLA does not authorize federal S & Ls to provide brokerage services, their service corporations or the subsidiaries thereof may not be used to expand the scope of permissible activities. Under SIA's interpretation, service corporations may only facilitate activities closely connected to and supportive of the permitted activities of federal S & Ls; they may not engage in entirely new businesses which would be impermissible if attempted by an S & L itself.

Such a narrow interpretation is not supported by either the language of HOLA or its legislative history. See *infra.* Moreover, from a common sense perspective, SIA's argument is illogical. If Congress intended to restrict the activities of service corporations to only those permitted to the federal associations, there would have been no need for service corporations or for section 5(c)(4)(B) of HOLA, 12 U.S.C. § 1464(c)(4)(B).

After reviewing the proposed activities, the Board's General Counsel, in a lengthy legal opinion, explained his reasons for finding that the brokerage and investment advisory services in question are "reasonably related" to the activities of federal associations.

In support of that conclusion, he noted, first, that the statutory scope of the activities in which federal associations may engage has been expanded in recent years.[19] Next, the General Counsel concluded that

---

from mutual to stock organizations. The court reasoned that

> by declining to act despite the Bank Board's known policy of continuing conversions, Congress has tacitly approved the FHLBB's action.

624 F.2d at 499.

**17.** See *National Bank of Elizabeth v. Smith,* 591 F.2d 223, 233 (3d Cir.1979). See also, H.R.Rep. No. 1703, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code & Ad.News 3416, 3443–44.

**18.** SIA argues that the "reasonably related" standard, as construed by the Board is "impermissibly broad and misinterprets congressional intent." Plaintiff's Further Memorandum at 19.

**19.** Traditionally, the investment power of federal associations had been limited to residential mortgages. However, in 1980, Congress enacted the Depository Institutions Deregulation and Monetary Control Act, which amended HOLA to permit federal S & Ls to invest in commercial

the purchase and sale of investments are generally related to the powers of the federal associations, including trust powers, and that many trustees invest in debt and equity securities on behalf of the trust beneficiary.[20] He found, further, that the services provided by the SAIs investment centers would move S & Ls closer to the "family financial centers" which Congress envisioned, providing a broad range of customer financial services,[21] and that the centers, in addition to providing brokerage and investment advisory services, will provide through four operating divisions support services in the areas of marketing, education, research, and technical assistance, activities which are on the list of pre-approved service corporation activities. See 12 C.F.R. § 545.9–1(c)(2)(iii), (viii). Finally, the General Counsel noted that, because of the changing financial services markets, consumers now consider certain securities investments customary alternatives to the traditional savings and borrowing products offered by S & Ls. "In short, investments in securities may stimulate consumer savings and borrowing to a sufficient degree that [the Board] may consider the resulting product and account relationship to have moved so closely to the nature and purpose of more traditional depository products as to come within the reasonably related authorities of federal savings and loan associations." R. at 24.[22]

These conclusions are clearly not unreasonable, both on their face and in light of the legislative purpose (see *infra*). Deference to this particularized determination of the agency's chief legal officer is particularly appropriate where, as here, the issue is not governed by clear expressions in the statute. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 560, 100 S.Ct. 790, 794, 63 L.Ed.2d 22 (1980).[23] For these reasons, the Board's determination that the provision of brokerage services is reasonably related to the activities of federal associations will be upheld as having a rational basis in the administrative record and as being "sufficiently reasonable." *Federal Election Commission v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981); *A.G. Becker v. Board of Governors*, 693 F.2d 136, 140 (D.C.Cir.1982).

## VI

The House Committee Report which accompanied the 1964 HOLA amendments

---

paper and in certain open-end money market mutual funds. Congress also authorized S & Ls to invest in, sell or otherwise deal with certain designated securities which are generally government issues or insured. See 12 U.S.C. §§ 1464(c)(1)(C), (D), (E), (F), (H), (N), and (Q). Although the proposed brokerage services of the service corporations differ in scope from the permissible investment activities of federal associations, the General Counsel concluded that the Board could find them to be reasonably related.

**20.** Although the General Counsel noted that the relationship between a trustee and a beneficiary differs significantly from that of a broker and a customer, he found that a broker who invests in securities by the direction and for the account of a customer is similar to a trustee.

**21.** In the Committee Report accompanying the Depository Institutions Deregulation and Monetary Control Act of 1980, Congress expressed its desire to transform home mortgage providers into "one stop family financial centers." S.Rep. No. 96–368, 98th Cong., 2d Sess., *reprinted in* 2 U.S.Code & Ad.News 236, 248 (1980).

**22.** See also, Digest and Recommendation of Atlanta Supervisory Agent Thomas F. Sharkey, in which he found that the proposed securities brokerage services are reasonably related to the operations of a federal S & L. "The proposed services would complement the financial services presently offered by federal associations and their service corporation subsidiaries and would make S & Ls more competitive by bringing them closer to the goal of full-service financial centers for their customers." R. 40. And see, Opinion Letter of Counsel for California Federal Savings & Loan Association of December 4, 1981 at 8–10, R. 92–94, and Opinion letter of Counsel for Coast Federal Savings & Loan Association and Perpetual S & L of August 25, 1981 at 10–14, R. 116–120. (Proposed activities are "reasonably related" to the activities of federal associations.)

**23.** Section 5(c) of the HOLA which authorizes federal associations to invest in service corporations does not place any restrictions on the activities of service corporations or their investment in subsidiaries. Furthermore, the Act does not require the Board to apply the "reasonably related" standard when it considers service corporation applications.

which authorized S & Ls to invest in service corporations states that:

> This provision will permit Federal Savings and Loan associations to invest in service corporations established to render data processing services or other needed services to savings and loan associations. It would also permit Federal [S & Ls] to invest in certain state corporations organized under state law whose purpose is to assist savings and loan associations in more fully meeting the mortgage needs of the area.

The Committee went on to state that it would be in the public interest to permit S & Ls to invest up to two percent of its assets in corporations such as Central S & L of New Jersey.[24] However, it noted that

> The authority granted by section 805 would be subject to rules and regulations of the Federal Home Loan Bank Board and the committee does not contemplate that an association would be permitted to invest in ordinary profitmaking corporations or corporations not closely related in purpose to the savings and loan business.

H.Rep. 1703, *reprinted in* 1964 U.S.Code & Ad.News 3416, 3443–3444.

The House subsequently adopted an amendment proposed by Congressman Widnall which lowered the amount of permissible investment from two to one percent of the S & L's assets and which eliminated the introductory phrase "Subject to rules and regulations of the Board." Congressman Widnall explained the purpose of the amendment as follows:

> [T]he purpose of this amendment is simply to make it clear that Federal savings and loan associations may invest in the securities of certain State chartered corporations whose purpose is to supplement and facilitate the services of the savings and loan Associations. In my State, the Central Corporation of Savings and Loan Associations, organized under State law, has served a useful purpose and we want to make sure that Federal savings and loan associations in New Jersey may invest in that corporation if they wish to.
>
> By eliminating the power to regulate such investments, we make certain that the New Jersey corporation will not be discriminated against solely because its charter might permit it to do a wider variety of things than a Federal agency might consider proper.
>
> To give assurance that this will have no significant effect on the basic purpose of Federal savings and loan associations, my amendment would also reduce from 2 percent to 1 percent the portion of assets that may be invested. In other words, it would reduce the amount that a Federal association could invest in State corporations to such a small percentage of its assets that it would not be necessary to prescribe further restrictions and regulations.

110 Cong.Rec. 19332–3 (1964).

The Conference Committee adopted the Widnall amendment and Congress enacted the bill without further comment.

SIA contends that Congress has not acquiesced in the Board's interpretation. Citing to more recent congressional action—or rather inaction—SIA argues that by refusing to adopt the Board's suggested legislative clarification of section 5(c)(4)(B), Congress disapproved the Board interpretation and expressed its intent that service corporations not engage in any activity not permitted by S & Ls themselves.[25] The Court does not agree.

---

**24.** Central S & L of New Jersey which was the model for this legislation, had been granted virtually unlimited authority by its certificate of incorporation. In fact, the Board notified Congress that it objected to the House version of the pending legislation due to its concern regarding Central's vast powers.

**25.** SIA relies on the Conference Report which provides in pertinent part:

> The managers want to stress that by specifically approving certain expanded powers and activities for thrift institutions and by not authorizing the Federal Home Loan Bank Board to permit service corporations to engage in any new activities not previously authorized, the managers intend that henceforth

■ First, Congress' failure or refusal to adopt clarifying amendments sponsored by an agency is not legislative history demonstrating a congressional construction of the meaning of a statute. In *American Trucking Association v. Atchison, Topeka & Santa Fe Railway Co.*, 387 U.S. 397, 417–418, 87 S.Ct. 1608, 1619, 18 L.Ed.2d 847 (1967), the Supreme Court stated that

> The advocacy of legislation by an administrative agency—and even the assertion of the need for it to accomplish a desired result—is an unsure and unreliable, and not a highly desirable, guide to statutory construction. The possibility of its use to prove more than it means may, but should not, deter administrative agencies from seeking a helpful clarification of authority or a fresh and specific congressional mandate.

Second, by expanding the direct investment authority of S & L associations,[26] albeit not to the extent suggested by the Board, Congress could not be said to have impliedly revoked the power of service corporations to engage in certain activities. Rather, Congress left section 5(c)(4)(B) intact, and with it the Board's broad authority to approve investments in service corporations which provided services which the Board found "reasonably related" to the activities of federal associations.

Third, it is apparent that the Conference Committee's statement of policy—that the Board should refrain from expanding the permissible activities of service corporations (see note 25 *supra*)—was intended to apply only prospectively. "[T]he managers

> the FHLBB should not approve, in absence of clear and specific Congressional authorization, any new regulation expanding activities of service corporations other than to permit service corporations to engage in activities permitted for federal thrift institutions.
> S.Rep. No. 97–641, 97th Cong., 2d Sess. 88 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3054, 3131.

**26.** The Garn-St. Germaine Depository Institutions Act of 1982 permits S & Ls to engage in commercial lending up to a specified percentage of their assets, and increases the percentage of assets that can be used for consumer lending from 20 to 30 percent. In addition, the Act

intend that *henceforth* the FHLBB should not approve, in the absence of clear and specific Congressional authorization, any *new* regulation ..." (emphasis supplied). The Report explained that

> The conferees are aware that the Bank Board presently is considering proposed regulations that would expand significantly the permitted range of activities for service corporations. In light of the specific additional powers authorized for savings and loan institutions in this bill, the conferees intend that the Board shall withdraw and take no further action on the proposed regulations. Of course, the House and Senate conferees reserve the right of their respective banking committees to review activities *previously* authorized by the Bank Board.

Joint Explanatory Statement of the Committee of Conference, 97th Cong., 2d Sess., at 88 (1982). In response to this Congressional statement, the Board withdrew proposed regulations which would have permitted service corporations to engage in far more activities than the limited brokerage and investment advisory services already approved by the Board. The proposed regulations would have permitted service corporations to organize, sponsor, operate, control, and render advise to an investment company and to underwrite, distribute, or sell securities in an investment company. See 47 Fed.Reg. 9855, 9859 (March 8, 1982). However, the activities challenged by SIA in this lawsuit were approved nearly five months *before* the Conference Committee issued its report.[27]

creates new overdraft authority, eliminates many restrictions on real property loans, mandates the creation of an account to be competitive with money market mutual funds, allows S & Ls to invest in governmental securities, and permits other additional investment authority. Congress, however, deleted language that would have permitted S & Ls to offer their own mutual funds.

**27.** Both the House and Senate banking committees were aware of the Board's May 6, 1982 action. The Board's General Counsel mailed a full legislative package describing the Board's action to Christopher Towe, Counsel to the House Subcommittee on Financial Institutions

Fourth, the Board has over the years expanded the permissible scope of activities in which service corporations could engage.[28] Congress, which was and continues to be fully apprised of the Board's regulatory amendments authorizing service corporations to engage in a variety of profit-making activities, has declined to act, and it has thereby tacitly approved the Board's policy of expanding the scope of permissible activities of service corporations.[29] "While [this kind of] Congressional inaction is not controlling, it is certainly persuasive." *York v. FHLBB*, 624 F.2d 495, 499 (4th Cir.1980).[30]

### VII

SIA argues that the Board acted contrary to law when it approved the activities as "reasonably related" because it failed to consider whether or not these activities are consistent with the "best practices" of local mutual thrift institutions.[31] It is SIA's belief that, had the Board considered the proposals against this statutory standard, it might have concluded that the brokerage and investment advisory services sought to be offered by the subsidiary of S & Ls' service corporations would adversely affect the financial strength of the participating S & Ls and possibly jeopardize their continued ability to provide home financing funds.[32] This objection also lacks merit.

In the first place, it is unclear whether the "best practices" standard set forth in section 5(a) of the HOLA is applicable to this case at all, for it relates only to the Board's authority to govern federal S & L associations directly. By contrast, section 5(c), which confers rule-making authority over service corporations, does not even mention the "best practices." In any event, however, the administrative record demonstrates that the Board did adequately evaluate the economic feasability of the

---

of the House Committee on Banking, Finance and Urban Affairs, on May 14, 1982. In addition, counsel for the S & L applicants sent a letter to Senator Garn, Chairman of the Senate Committee on Banking, Housing and Urban Affairs informing him of the Board's and SEC's action in this case.

**28.** For example, service corporations may make consumer loans; provide tax return preparation services; acquire, maintain, and manage real estate for certain purposes; serve as insurance agents and brokers; and advise administrators of employee benefit plans.

**29.** Congress clearly had the opportunity to make whatever changes it deemed necessary to clarify what, if any, restrictions it intended to impose on the activities of service corporation subsidiaries. Since 1964, the date when the service corporation provision was added, HOLA has been amended 11 times. In 1980, Congress enacted the Depository Institutions Deregulation and Monetary Control Act which made substantial changes in the statutes that govern financial institutions. Notwithstanding Congressional attention to the service corporation issue, section 5(c)(4)(B) was reenacted without material change.

**30.** See also *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980).

**31.** Section 5(a) of HOLA, 12 U.S.C. § 1464(a), provides in pertinent part:

the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations ... and to issue charters therefor, giving primary consideration to the best practices of thrift institutions ....

**32.** To support its theory, SIA relies upon the first opinion of the Supervisory Agent of the FHLBB of Atlanta who evaluated the joint application of Coast Federal and Perpetual. The Agent recommended that the application be denied because, among other things, the speculative nature of the brokerage business would not promote thrift; the participating S & Ls could be exposed to tremendous potential liability by giving advice to customers concerning speculative investments as opposed to accepting deposits in insurance accounts; the costs needed to implement the program and to train S & L personnel would be prohibitive; and S & Ls would dilute their present services by offering brokerage services. R. 39.

The Atlanta Bank Board, however, withdrew these objections before the Board ruled on the applications because it found that

circumstances have changed dramatically within the savings and loan industry. While the application contains requests for authority to engage in activities which are not traditional savings and loan functions, we are now convinced that our members need every tool available to generate profits. R. 40

proposed program and its potential impact on participating S & L associations.[33]

At the hearing in which the applications were approved, Chairman Pratt stated that

I believe [approval of the application] is consistent with the position this Board has taken on many occasions in the past year, that the marketplace today and the economic circumstances demand the maximum flexibility in the operation of financial institutions and that success is going to be in the hands of management and their ability to identify the services which are demanded by the public and which serve a public interest. And it is in this spirit and fashion that the Board considers this application.

R. 12–13.[34]

The Board's General Counsel explained the premises underlying the programs projects financial success, pointing out that SIAS will be able to draw customers from a relatively large base established by the participating S & Ls, and that the anticipated low level of trading activity per customer will therefore be offset by the volume of trading generated by the large number of investment centers and, eventually, of participating S & Ls. He also noted that the start-up costs will be kept to a minimum because S & Ls will use their existing resources *i.e.*, their existing customer base, office facilities, and personnel. By affiliating with known experts in securities trading and research, financial planning and investment advisory services, and EDP technology, participating S & Ls will be able to provide professional service at minimal costs.

The safeguards required by HOLA (*e.g.*, the limitation on the amount of money an association may invest in service corporations to no more than three percent of its assets, 12 U.S.C. § 1464(c)(4)(B)), and the

conditions required by the Board before approving the applications, will further protect participating S & Ls from the risk of loss and potential exposure to liability which might possibly result from what plaintiff characterizes as a "high risk business." Moreover, the customers of brokerage services offered by S & L investment centers will be better protected than customers of regular brokerage houses because the investment centers will be under the jurisdiction of and subject to regulation by the National Association of Security Dealers, the Securities and Exchange Commission, *and* the federal examiners in the employ of the Bank Board. Finally, experience has shown that S & L service corporations are a source of financial strength to S & Ls. See Defendants' Exhibit 15.

In directing the Board to give primary consideration to the best practices of local mutual thrift and home financing institutions, the Congress did not intend to limit the Board to the "best practices" of 1933. To the contrary; if the congressional mandate is to be fulfilled, the Board's role must be a dynamic rather than a static one. *National State Bank of Elizabeth v. FHLBB*, Slip Op. No. 76–1479 at 5 (D.N.J. 1979); *Bridgeport Federal Savings & Loan Ass'n v. FHLBB*, 307 F.2d 580, 584 (3d Cir.1962). And the Board must be given flexibility to respond to the changing economic conditions and to permit federal S & Ls, within the statutory limitations, to meet the service requirements of their customers in an increasingly competitive market. There are several developments which the Board could legitimately take into account in this regard.

The thrift industry has suffered serious financial difficulties in recent years due to inflation and high interest rates. The dete-

---

**33.** HOLA does not require the Board to make specific findings that the activities comport with the "best practices"; section 5(a) merely requires that they be considered.

**34.** SIA's argument that the expected profitability and flexibility that the proposed programs will give participating S & Ls does not provide a basis for the Board's decision to approve the

applications is absurd. Because of the economic difficulties plaguing many S & Ls, the profit potential of a proposed activity would be of paramount concern to the Board when it considers whether the activity would comport with the "best practices" of local mutual thrift and home financial institutions.

rioration of that industry is due in large part to the difference between recent high and volatile interest rates and the low rates paid on long-term mortgage portfolios held by S & Ls. In its brief, the Board states that the average 30 year fixed rate mortgage portfolio of S & Ls yields 10.02 percent, whereas the cost of funds to these associations is approximately 11.53 percent. Defendants' Brief at 2 (citing 15 Federal Home Loan Bank Board Journal 41–42 (July 1982)). As a result of this difference S & Ls are losing substantial sums of money. In 1981 alone the net worth of the S & L industry was reduced by five billion dollars.[35]

Moreover, the successful development and marketing of new accounts, such as the money market mutual funds marketed by brokerage houses, have contributed to the outflow of funds from commercial banks, savings banks, and S & Ls.[36] If S & Ls are to exploit the new and competitive opportunities that emerge, and if they are to realize a profit, they must be permitted to engage in activities other than those expressly provided for in 1933 when HOLA was enacted. The financial services market is becoming increasingly competitive and the Board needs flexibility to adapt and respond to the changing economic circumstances.

The overriding fact is that the Congress charged the Board with the task of preserving the financial health and integrity of the S & L industry. *Fidelity Federal S & L Ass'n de la Cuesta, supra,* 458 U.S. at 168, 102 S.Ct. at 3030; *Independent Bankers Assoc. of America v. FHLBB,* 557 F.Supp. 23 (D.D.C.1982). In approving the S & L applications in question, the Board reasonably exercised that responsibility and its authority under HOLA so as to ensure the future financial stability of these institutions.[37]

## VIII

SIA's final argument is that the Board's ruling contravenes section 21 of the Glass-Steagall Act, 12 U.S.C. § 378. That provision of law prohibits corporations from both receiving deposits and engaging in the business of issuing, underwriting, selling, or distributing securities.[38] SIA maintains that, because S & Ls receive deposits subject to repayment upon the presentment of a passbook or upon request of the depositor, they may not engage in the securities activities at issue here.

The problem with this argument is that the Board authorized S & Ls to invest only in service corporations, and that these corporations will provide brokerage and in-

**35.** SIA concedes that S & Ls "may be experiencing the most severe pressures felt by any type of depository institution since the Great Depression." Plaintiff's Brief at 2.

**36.** Money market mutual funds enable small and large investors to pool their assets so that they may buy larger demonination investments in highly rated short and medium term investments in bank certificates of deposit, commercial paper, government obligations, and banker's acceptances. Several members of SIA offer accounts in these funds.

The Board states that deposits in such funds has grown from $2.4 to $218.3 billion in 1982. Defendants' Exhibit 3, May 1982 Federal Reserve Flow Funds, Q1.

**37.** Related case law also supports the Board's ruling in this respect. In the two principal cases which have examined the Board's authority to regulate the activities of service corporations, the courts held that the Board could permit S & Ls to invest in corporations which

engaged in activities not expressly authorized by the HOLA. *Rettig v. Arlington Heights Federal Savings and Loan Association,* 405 F.Supp. 819, 824 (N.D.Ill.1975); *Smith v. Jaques,* C.A. No. 75–939 (D.Ore. December 12, 1976). Noting that the Board had plenary authority in the area, both courts upheld the Board's approval of the investment by federal S & Ls in insurance agency service corporations.

**38.** Section 21 provides in pertinent part:
it shall be unlawful—
(1) For any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt, or upon request of the depositor.

vestment advisory services.[39] Even it is assumed *arguendo* that the proscriptions of the Glass-Steagall Act apply to S & Ls, they are clearly inapplicable to service corporations that will not and cannot receive deposits. As the Supreme Court found in *Board of Governors v. Investment Co. Institute*, 450 U.S. at 58 n. 24, 63–64, 101 S.Ct. at 982 n. 24, 985 (1980),

> [T]he language of § 21 cannot be read to include within its prohibition separate organizations related by ownership with a bank, which does receive deposits.

In view of the number of prophylactic measures required by the Board (see *supra*), it is clear that the S & Ls will and must treat their service corporations as wholly separate organizations.[40]

For the same reasons that HOLA does not restrict S & L service corporations from engaging in activities that would be impermissible for the S & L itself, so, too, the Glass-Steagall Act does not restrict the activities of such corporations. See *Board of Governors v. Investment Co. Institute, supra,* 450 U.S. at 60, 64, 101 S.Ct. at 983, 985.[41]

This conclusion will not frustrate the policy considerations underlying the enactment of the Glass-Steagall Act—to keep commercial banks out of the investment banking business because their entry into that business might be destructive both of prudent and disinterested commercial banking and of public confidence in the commercial banking system. *Investment Co. Institute v. Camp*, 401 U.S. 617, 634, 91 S.Ct. 1091, 1100, 28 L.Ed.2d 367 (1971).[42] This is so for four interrelated reasons.

First, SAIS will not trade for its own account, but will purchase securities only for the account of customers.[43] Second, an

---

**39.** SIA argues that due to the substantial structural and financial relationship between S & Ls and SAFC (*i.e.,* S & Ls will establish investment centers in their offices staffed by personnel compensated in part by the S & Ls and the S & Ls will share in the commissions) "there is no logical basis by which to conclude that the S & Ls are not themselves acting as broker-dealers." Plaintiff's Brief at 31.

**40.** The separate corporate identity of a service corporation subsidiary is also required under the Board's policy which provides that

> To ensure judicial recognition of the separate corporate existence of service corporations, the institution and its service corporations should operate so that: (1) Their respective business transactions, accounts, and records are not intermingled; (2) each observes the formalities of their separate corporate procedures; (3) each is adequately financed as a separate unit in the light of normal obligations reasonably forseeable in a business of its size and character; (4) each is held out to the public as a separate enterprise; and (5) the insured institution does not dominate the service corporation to the extent that the latter is treated as a mere department of the former.

12 C.F.R. § 570.10.

**41.** The Court noted in that case that the Glass-Steagall Act does not require the association between the entity receiving deposits and the securities company to be "completely obliterated." 450 U.S. at 67 n. 39, 101 S.Ct. at 987 n. 39.

**42.** In enacting the Glass-Steagall Act, Congress was mindful of not only the obvious danger that a bank might invest its own assets in imprudent securities investments but also of the more subtle hazards that could result from the close association of commercial and investment banking. *Investment Co. Institute v. Camp*, 401 U.S. at 630–34, 91 S.Ct. at 1098–1100; see also *Board of Governors v. Investment Co. Institute*, 450 U.S. at 66–67 n. 38, 101 S.Ct. at 987 n. 38.

**43.** Plaintiff also relies upon section 2(a)(40) of the Investment Company Act, 15 U.S.C. § 80a–2(a)(40), which provides that "underwriter" includes "any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security ...." What plaintiff neglects to cite, however, is a proviso in that same subsection which excludes mere sales agents from the definition of underwriter:

> such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributor's or seller's commission.

15 U.S.C. § 80a–2(a)(40). SAIS will have no proprietary interest in the mutual funds and it will receive only the customary seller's commission. Unlike the situation in *Investment Co. Institute v. Camp, supra,* where the Court held that the offer and sale of mutual fund shares by a covered institution violated section 21, SAIS—the sales agent in this case—will not own the fund and therefore will have no vested interest in promoting sales of mutual fund shares as opposed to other securities. In short, SAIS' activities in question do not constitute underwriting.

S & L may invest no more than three percent of its assets in a service corporation subsidiary, and the public will thus be protected against unsound diversions of assets. Third, because SAIS will be separate corporations, the risk that S & Ls will lose the good will of their customers will be minimized. Finally, notwithstanding their interest in sales commissions, the S & Ls will not have a conflict of interest in rendering investment advice or in recommending a particular security due to the requirements imposed by the Board.

 For these reasons, the Court concludes that the limited brokerage and investment advisory activities to be conducted by S & L service corporation subsidiaries do not violate either the HOLA or the Glass-Steagall Act. Judgment will be entered for the defendants.